AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

FILED

MAR – 7 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

In the Matter of the Search of                    )
                                                  )
INFORMATION ASSOCIATED WITH FACEBOOK USER ID:    )    Case No.      4:19 MJ 1105 JMB
100009486767997 THAT IS STORED AT PREMISES        )
CONTROLLED BY FACEBOOK, INC.                      )
See Attachment A.                                 )

## APPLICATION FOR A SEARCH WARRANT

I, __Daniel J. Zwiesler_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

FACEBOOK USER ID:  100009486767997
SEE ATTACHMENT A.

located in the     NORTHERN     District of _____CALIFORNIA_____, there is now concealed

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:2119 | Motor vehicle |
| 18:924(c) | Brandishing a firearm in furtherance of a crime of violence |
| 18:371 | Conspiracy |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Daniel J. Zwiesler
Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date:     March 7, 2019

*Judge's signature*

City and state:  St. Louis, MO

Honorable John M. Bodenhausen, U.S. Magistrate Judge
*Printed name and title*

AUSA:   J. Christian Goeke, #39462MO

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID (100009486767997) THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No.4:19 MJ 1105 JMB **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Daniel J. Zwiesler ("Affiant"), a Special Agent (SA) with the Federal Bureau of Investigation (FBI) St. Louis Division, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I am a Special Agent (SA) with the FBI and have been so employed since September 2012.  Prior to this assignment, I was employed as a Police Officer by the City of Dayton Police Department for approximately ten years.  I have a Bachelor of Arts degree from Saint Louis University.  I received law enforcement training from the FBI Academy at Quantico, Virginia and state academies and seminars.  I have been assigned to criminal investigations

1

throughout my tenure as a Special Agent, predominantly working bank robberies, car jacking's, weapons violations, fugitives, Hobbs Act Robberies and violent crimes against children. I am currently assigned to the FBI St. Louis Division's Violent Crime Task Force.

3.    Through the course of these investigations, I have been involved in the use of the following techniques: questioning of witnesses; interviewing confidential human sources; conducting physical surveillance; consensual and court authorized monitoring and recording of telephonic communications; analyzing telephone pen registers and caller identification system data; analyzing data from mobile telephones; and executing search warrants and arrest warrants. I have also received extensive training in the realm of social media applications and their use in FBI investigations. I have used social media, such as Facebook, to further my investigations and am familiar with the types of records Facebook retains.

4.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me concerning the investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, § 2119 (Motor Vehicles), § 924C (Possession of a Weapon in Furtherance of a Crime of Violence) and § 371 (Conspiracy) have been committed by Wesley Terrell Howard, a minor hereinafter referred to as KE (KE), and others yet unknown.

## BACKGROUND OF THE INVESTIGATION

5.    The Federal Bureau of Investigation (FBI) in conjunction with the St. Louis Metropolitan Police Department (SLMPD) have been investigating two carjackings which

2

occurred in violation of United States Code, § 2119, § 924C, and § 371. The incidents occurred on December 20, 2018, and December 21, 2018, within the City of St. Louis, within the Eastern District of Missouri. The incidents were documented under SLMPD reports 18-060069 and 18-060165.

6.　　On December 20, 2018, at approximately 6:00 PM, Martina Lee (Lee) parked her 2015 Chevrolet Camaro in the rear parking lot at 1123 South Tucker Boulevard, St. Louis, Missouri. As Lee exited her vehicle, two unknown black male suspects each armed with a handgun approached her and demanded car keys, cellular telephone and wallet. She complied with the suspects' demands after which the two suspects entered her vehicle and fled the location. The stolen vehicle was later recovered unoccupied in the 8400 block of Lowell Street, St. Louis, Missouri.

7.　　On December 21, 2018, at approximately 9:00 AM, Judith Ronzio (Ronzio), entered her blue 2016 Toyota RAV4 bearing Missouri license plate KE7-R2A in front of 1711 Park Avenue, St. Louis, Missouri at which time she observed an unknown black male wearing a grey hooded sweatshirt, dark pants and a black mask covering the lower portion of his face approach her. The suspect opened the driver's door, produced a black handgun and demanded that she exit the vehicle and to leave her phone in the vehicle. She complied with the suspect's demands. The suspect entered Ronzio's vehicle and fled east on Park Avenue.

8　　SLMPD detectives and officers conducted a canvass of the area attempting to locate any witnesses or video of the carjacking during which the contacted The Polite Society restaurant located at 1923 Park Avenue. Officers reviewed the security footage from the restaurant and observed two black males walking up and then down the sidewalk. One of the black males was

3

wearing a grey hooded sweatshirt and dark pants which matched the clothing description provided by Ronzio.

9.      On December 21, 2018, at approximately 9:10 PM, a SLMPD patrol officer in a marked police vehicle observed Ronzio's blue Toyota RAV4 parked facing westbound on Delmar Boulevard. The stolen vehicle was occupied by three subjects. When the officer activated his emergency lights, the driver of the vehicle immediately accelerated and fled driving erratically attempting to elude pursuing officers. The pursuit terminated in the rear alley in the 2700 block of Osage Street and two of the occupants of the stolen vehicle fled on foot. Officers gave chase and were able to apprehend the driver, identified as Wesley Terrell Howard (Howard) and one of the passengers, KE. The third occupant of the vehicle, a black female, eluded officers. During the foot chase, officers observed Howard to have a black pistol in his hand which he discarded during the chase. Howard and KE were taken into custody and the firearm, a black .40 S&W caliber FN Model FNS 40 loaded with 14 rounds of live ammunition and one live round in the chamber was recovered

10.     Officers determined KE was 16 years old and was later released to the custody his mother. Howard was interviewed by SLMPD detectives following his arrest.

11.     Howard was advised of his *Miranda* rights and agreed to speak with investigators. Howard claimed to be a passenger in the vehicle and claimed the other subject in the car, who he identified by a nickname as "KJ", (later determined to be KE) was the driver. He stated that the female passenger, "Yea Yea", was his girlfriend. Howard initially denied involvement in the carjacking, however, when shown a still photograph taken from the surveillance video referenced in paragraph 8 above, Howard admitted to taking Ronzio's vehicle.

4

12. SLMPD detectives also questioned Howard concerning the December 20, 2018 carjacking of a black Chevrolet Camaro. Howard told detectives his "uncle" was responsible for the carjacking who he identified as Phillip who utilized a Facebook account with the name "Phillip Jones." Howard stated he saw Phillip driving in a Camaro on December 20, 2018 wearing a burgundy and white outfit. Howard admitted riding in the black Camaro with Phillip.

13. On February 1, 2019, your Affiant interviewed Howard's mother, Cynthia Boyd (Boyd) who stated that Howard used the nickname "Lil Wes" and that she was aware that Howard was incarcerated after being caught in a stolen vehicle. Boyd was shown the still photograph taken from surveillance video related to the December 21, 2018 carjacking and identified the subject wearing a grey hooded sweatshirt as her son Howard and the subject with Howard as a person she knew as "KJ".

14. On February 5, 2019, Laketria Pearson (Pearson) was interviewed. Pearson stated her son was KE and confirmed her son's nickname was "KJ" who had a Facebook account under the name "KJ Blood." Pearson recalled the December 21, 2018 incident involving her son because she picked KE up from a local hospital after he was caught in a stolen vehicle.

15. Pearson stated Howard had called her multiple times from the city jail attempting to speak with her son. She also spoke with Boyd, Howard's mother, following the incident.

16. Pearson was shown the same still photograph that was shown to Boyd and stated she did not recognize either of the two subjects depicted.

17. Pearson told Agents she had not personally seen KE in possession of a handgun but had seen a picture of KE holding a gun that was posted to his Facebook account.

5

18.     On February 8, 2019, KE was interviewed by your Affiant. KE stated he worked at Job Corps. KE was shown the booking photograph of Howard who he identified as "Lil Wes" from Job Corps.

19.     KE stated he ran into Howard during Christmas break at a store early in the morning on the day he was involved in the high speed pursuit. KE stated he and Howard traveled by bus to Howard's residence located in the Peabody-Clinton Housing Community so that Howard could change clothes. Howard left the residence alone and returned approximately 15 minutes later driving a small blue four-door SUV. KE stated he got into the vehicle driven by Howard and the pair departed. While at the residence, KE stated that he met Howard's mother.

20.     KE stated he rode around with Howard during the day and picked up two girls they met while riding the bus earlier in the day and spent the day at the Chesterfield Mall. KE observed Howard using a cell phone and communicating with other people including his girlfriend "Yea Yea". They dropped off the two girls in the late afternoon and Howard drove to "Yea Yea"'s house located somewhere in north county.

21.     KE stated they picked up "Yea Yea" and drove to the Delmar Loop. KE stated he was driving the vehicle at this point and Howard and "Yea Yea" were in the back seat.

22.     KE stated while in the Delmar Loop area, the police pulled behind them and activated their light at which time KE fled with the police in pursuit. KE said that Howard told him not to stop because "he had just got out" and that Howard was armed with a black FN pistol. KE recalled the pursuit ended in an alley near his residence on Osage Street.

23.     KE stated that on December 22, 2018, the morning after the vehicle pursuit, he used a friend's cell phone to contact "Yea Yea" via Facebook. KE and "Yea Yea" exchanged telephone numbers and he spoke with her on the phone. "Yea Yea" provided KE with a telephone number

6

for Howard's mother and he in turn provided the telephone number for his mother. KE could not remember "Yea Yea"'s Facebook name but stated the two were friends on Facebook. KE confirmed his Facebook account was under the name "KJ Blood." He described "Yea Yea" as a thin black female with long braids.

24.     On February 8, 2019, your Affiant was able to identify the Facebook accounts of KE and "Yea Yea". KE's Facebook profile name is KJ Blood, account number 100009486767997 (kenny.edwards.71). A review of KE's Facebook friends lead your Affiant to an account with profile name YaYa Jackson, account number 100015065199619 (yaya.jackson.359). The profile picture of the YaYa Jackson account depicted a thin black female with long braids.

25.     On February 11, 2019, your Affiant located and interviewed a minor hereinafter referred to as DJ (DJ) at her residence in North County. DJ confirmed her nickname was Ya Ya (pronounced yea-yea). DJ was shown the booking photograph of Howard who she immediately identified as Wesley Howard. DJ stated she met Howard while attending classes at Job Corps. When asked if she knew any one called KJ, DJ stated she only knew a KJ whose first name was Kenny and that Kenny attended classes at Job Corps.

26.     DJ admitted to being in a blue four-door SUV with Howard and KE when it was involved in a high speed pursuit. The day of the pursuit, Howard and KE picked her up at her house and drove to the Delmar Loop. DJ stated that while driving to the Delmar Loop she observed a black pistol in the glovebox of the SUV. DJ stated that after arriving in the area of the Delmar Loop, the police pulled behind the blue SUV and attempted to stop the car but KE refused to pull over and fled at a high rate of speed. DJ recalled the vehicle pursuit went through downtown and eventually ended somewhere in south city St. Louis. When the pursuit ended, Howard and KE fled the vehicle on foot with the police in pursuit. DJ stated she remained with the vehicle but the

7

police did not come back to the car so she left and was eventually picked up by her mother at a gas station.

27.     DJ stated that earlier on the day of the pursuit she was communicating with Howard and KE via Facebook. DJ confirmed that her Facebook page was under the name YaYa Jackson. DJ stated that Howard used his sister's Facebook account to communicate with her but that she did not remember the name of Howard's sister and that Howard's sister blocked her on Facebook and she did not remember the name of the account.

28.     DJ stated that a few days after the car pursuit Howard called her from jail and admitted knowing that the vehicle was stolen and apologized to her.

## **FACEBOOK**

29.     Through my training, experience, and previous investigations, I have learned that subjects utilize Facebook and Facebook Messenger to communicate because it allows subjects to continue to communicating when a phone number changes or a device was lost or stolen. Furthermore, Facebook Messenger communications are not extracted when a phone is seized and/or imaged.

30.     During previous investigations of violent crimes, including carjackings, subjects committing violent crimes often communicate with other individuals immediately before or after the commission of crimes. These communications may involve text messages, pictures, calls or videos being sent and received via Facebook or other social media.

31.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

8

32.    Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their

9

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account.

10

Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

43.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

11

44.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.    Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.]]

47.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

48.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on

12

Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

49.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

50.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook

13

account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

51.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

52.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information

14

(including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

53.     Based on the forgoing, I request that the Court issue the proposed search warrant.

54.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

55.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

66.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

_____     3-7-2019
Special Agent Daniel Zwiesler, FBI     Date

_____     2/7/19
The Honorable Magistrate Judge John M. Bodenhausen     Date

15

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

a.   Kenny Edwards, Facebook Name: KJ Blood

   Facebook Number: 100009486767997 (kenny.edwards.71)

   Facebook URL: https://www.facebook.com/kenny.edwards.71

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.   Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or

control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information

that have been deleted but are still available to Facebook, or have been preserved pursuant to a

request made under 18 U.S.C. § 2119 (Motor vehicles) and 18 U.S.C. § 924C (Possession of a

Weapon in Furtherance of a Crime of Violence) and § 371 (Conspiracy), Facebook is required to

disclose the following information to the government for each user ID listed in Attachment A:

      (a)     All contact and personal identifying information, including: full name, user

identification number, birth date, gender, contact e-mail addresses, Facebook

passwords, Facebook security questions and answers, physical address (including

city, state, and zip code), telephone numbers, screen names, websites, and other

personal identifiers, group identification number, a list of users currently registered

to the group, and Group Contact Info, including all contact information for the

creator and/or administrator of the group and a PDF of the current status of the

group profile page.

      (b)     All activity logs for the account and all other documents showing the user's posts

and other Facebook activities;

      (c)     All photos and videos uploaded by that user ID and all photos and videos

uploaded by any user that have that user tagged in them;

      (d)     All profile information; News Feed information; status updates; links to videos,

photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, any saved content of video and voice calling, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All Facebook Messenger content information, including all GPS locations and IP addresses of connected devices and routers;

(h) All IP logs, including all records of the IP addresses that logged into the account;

(i) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j) All information about the Facebook pages that the account is or was a "fan" of;

(k) All past and present lists of friends created by the account;

(l) All records of Facebook searches performed by the account;

(m) All information about the user's access and use of Facebook Marketplace;

(n) The types of service utilized by the user;

(o) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2119 (Motor vehicles) and 18 U.S.C. § 924C (Possession of a Weapon in Furtherance of a Crime of Violence) and § 371 (Conspiracy), involving identified suspects since inception, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)     Evidence indicating communication regarding the armed carjacking, weapon violations and conspiracy;

(b)     Evidence indicating the transfer, purchase, or trade of weapons.

(c)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(f) The identity of the person(s) who communicated with the user ID about matters relating to armed carjackings that occurred between December 1, 2018, to February 15, 2019, including records that help reveal their whereabouts.